**STATIC CONTROL COMPONENTS, INC., Plaintiff,**

v.

**DARKPRINT IMAGING, INC., Defendant.**

**No. 1:99–CV–00612.**

United States District Court, M.D. North Carolina.

Oct. 9, 2002.

466

William L. London, III, Sanford, NC, Jennifer Heisinger, Joseph C. Smith, Jr., Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO, for Plaintiff.

Laurie J. Bremer, Douglas W. Kenyon, Matthew Patrick McGuire, Hunton & Williams, Raleigh, NC, Timothy P. Getzoff, Donald A. Degnan, Chrisopher H. Toll. Holland & Hart, LLP, Boulder, CO, for Defendant.

## MEMORANDUM OPINION

TILLEY, Chief Judge.

This case is before the Court on Defendant Darkprint Imaging Inc.'s Motion for Judgment as a Matter of Law Pursuant to Rule 50, or for a New Trial Pursuant to Rules 59 and 60(b)(3) [Doc. # 137], as well as Plaintiff Static Control Components, Inc.'s motion for unfair and deceptive trade practices and for attorney's fees [Doc. # 116]. For the reasons set forth below, Darkprint's motion is GRANTED IN PART and DENIED IN PART and Static Control's motion is GRANTED IN PART.

### I.

Static Control is a North Carolina corporation that distributes aftermarket components and toner for businesses that remanufacture spent or worn laser toner cartridges. These parts become substandard through the normal wear and tear of cartridge use. The aftermarket can be contrasted with new toner products developed by original equipment manufacturers (hereinafter "OEMs"). Remanufacturers refurbish used cartridges by replacing de-

fective parts, normally, with aftermarket parts and, then, refilling the cartridges with toner. The type cartridge and the particular parts used in the remanufacture may work extremely well with one or more of the different toners available in the aftermarket and very poorly with others, even when others have been "designated" by its manufacturer for use in that particular type cartridge.

In supplying remanufacturers with toner for use in refurbished cartridges and in order to determine which toners will work best with particular components, Static Control conducts a battery of technical and print tests. Static Control, as well as other distributors, gets its toner from toner manufacturers [1] who sell toner specifically targeted to particular toner cartridges. For example, a manufacturer will produce a toner and sell it for use in an EX toner cartridge, which is one of many cartridges available to remanufacturers. Static Control has determined, however, that the toners a manufacturer may designate for certain cartridges sometimes works better in other types of cartridges. For example, Static Control could find that a toner the manufacturer designates for an EX toner cartridge in fact works best with an SX toner cartridge. Static Control determines information about the chemical and physical properties and traits of toners through scientific testing and exhaustive print testing. Static Control tests numerous toners for each cartridge. Often toners that were "tested but not used"—that is, tested but not adopted by Static Control as the specific toner it will repackage and offer to the market for use with specific cartridges or cartridges using specific components—are identified as good alternative toners in case of a market shift.[2] Static Control considers its "tested but not used" toner information to be a trade se-

cret because it identifies second-best or next-best alternate toners that could be used in place of the toners Static Control uses at a given time.

Static Control brought suit against Darkprint, alleging that Darkprint misappropriated its trade secrets, tortiously interfered with its employment agreements, and engaged in unfair trade practices. Specifically, Static · Control argued that Darkprint hired toner scientist Lauren Hulse in violation of Static Control's non-competition agreement with Mr. Hulse and thereafter used Mr. Hulse to obtain Static Control's customer, vendor, and technical toner trade secret information. The specific toner trade secret information Static Control claimed at trial was the "tested but not used" information. Pertinent facts of the case will be discussed below in reference to the specific arguments Darkprint has advanced in its motion.

After Darkprint's motions for summary judgment were denied, a bifurcated jury trial was held from October 23, 2001 through November 5, 2001. Because of the complexity of the trade secret misappropriation issues, the jury was provided with a detailed verdict sheet on which to mark whether Darkprint had misappropriated specific trade secret information and whether Darkprint had tortiously interfered with Mr. Hulse's non-competition agreement. The jury found the following: (1) that as to each toner Darkprint offered for sale during the period in question, Darkprint had misappropriated Static Control's "tested but not used" information; (2) that Darkprint had tortiously interfered with Mr. Hulse's non-competition agreement with Static Control; (3) that Darkprint had committed the acts supporting a finding of unfair and deceptive trade practices under North Carolina General

---

**1.** Static Control also refers to these toner manufacturers as vendors.

**2.** This information will be referred to as "tested but not used" toner information.

Statutes § 75–1.1; and (4) that Darkprint had not misappropriated Static Control's customer information. The jury awarded $346,045.07 in compensatory damages and $985,802.45 in punitive damages.

Darkprint now moves for judgment as a matter of law as to the non-competition agreement, the trade secret misappropriation, and damages. Darkprint also moves for a new trial pursuant to Fed.R.Civ.P. 59 and 60(b)(3) for alleged discovery misconduct, excessive punitive damages, inadequate damages calculations, inappropriate jury instructions, insufficient evidence of misappropriation, and several evidentiary matters.

## II.

Darkprint has moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50 on Static Control's tortious interference claims. Darkprint argues that the non-competition agreement between Static Control and Mr. Hulse is invalid as a matter of law and was not supported by sufficient evidence at trial. Specifically, Darkprint contends that the non-competition agreement is not reasonably restricted as to time and geographic scope. Darkprint also contends that the non-disclosure agreement between Static Control and Darkprint is invalid because it was not limited to confidential information.

The non-competition agreement states:

I agree not to compete directly or indirectly with Static Control Components, Inc. in its manufacturing and/or distribution of supplies to remanufacturers of laser printer cartridges for a period of two (2) years from the date of last compensation from Static Control Components, Inc.

This agreement is not limited to direct competition and is not limited to particular Static Control customers. Instead, the agreement, by its terms, would apply even

if Mr. Hulse was determined to compete even indirectly with Static Control.

### A.

Darkprint contends that the non-competition agreement between Static Control and Mr. Hulse is invalid for two reasons. First, Darkprint contends that the geographic and temporal scope of the agreement is overbroad. Second, Darkprint contends that Static Control presented insufficient evidence as to the date of Mr. Hulse's last compensation as a consultant. Darkprint also contests the jury's verdict in favor of Static Control on the tortious interference claim because it asserts that it should have been allowed to present evidence of Darkprint's subjective belief that the non-competition agreement was legally invalid.

#### i.

In order to present a prima facie case for tortious interference under North Carolina law, Static Control must show that: (1) there was a valid contract; (2) Darkprint knew of the contract; (3) Darkprint intentionally induced Lauren Hulse to breach the non-compete agreement, (4) Darkprint had no business justification; and (5) Static Control suffered actual damages. *United Labs., Inc. v. Kuykendall,* 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). For the covenant to be valid, it must be: (1) in writing; (2) a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) advance a legitimate business interest of the employer. *Farr Assocs., Inc. v. Baskin,* 138 N.C.App. 276, 279, 530 S.E.2d 878, 881 (2000); *Hartman v. W.H. Odell & Assocs.,* 117 N.C.App. 307, 311, 450 S.E.2d 912, 916 (1994). The validity of non-competition agreements is a matter of law to be decided by the court. *Farr Assocs.,* 138 N.C.App. at 279, 530 S.E.2d at 881.

ii.

■ Darkprint's first contention is that the geographic and temporal scope of the non-competition agreement is unreasonable, thus rendering the agreement invalid. As the plaintiff, Static Control has the burden of demonstrating that the non-competition agreement is reasonable. *Hartman,* 117 N.C.App. at 311, 450 S.E.2d at 916. Covenants not to compete must be reasonable both as to geographical and temporal restrictions, and courts must analyze these two restrictions "in tandem." *Precision Walls, Inc. v. Servie,* —— N.C.App. ——, 568 S.E.2d 267, 273 (2002); *Farr Assocs.,* 138 N.C.App. at 280, 530 S.E.2d at 881; *Wade S. Dunbar Ins. Agency, Inc. v. Barber,* 147 N.C.App. 463, 469, 556 S.E.2d 331, 335 (2001). North Carolina courts have determined that geographic restrictions are reasonable when they are narrowly tailored to protect the employer's business interests and do not work an undue hardship on the employee's later ability to work. *Harwell Enters., Inc. v. Heim,* 6 N.C.App. 548, 170 S.E.2d 540 (1969), *aff'd in part and rev'd in part on other grounds,* 276 N.C. 475, 173 S.E.2d 316.

■ Geographic restrictions are reasonable and not overly broad when the employer can demonstrate where its customers are located and that the geographic limitation is restricted to protect the customer relationships in that geographic area. *See Farr Assocs.,* 138 N.C.App. at 281, 530 S.E.2d at 882. North Carolina courts have enumerated the following factors to help determine whether the geographic restriction is reasonable: "(1) the area or scope of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his

knowledge of the employer's business operation." *Hartman,* 117 N.C.App. at 313, 450 S.E.2d at 917. The geographic restriction must not be wider than necessary to protect the employer's legitimate business interest. *Triangle Leasing Co., Inc. v. McMahon,* 327 N.C. 224, 229, 393 S.E.2d 854, 857 (1990); *Precision Walls, Inc.,* 568 S.E.2d at 273.

■ The application of the *Hartman* factors to the covenant at issue here presents unique issues because the agreement involves an employee who is not a salesperson, but is instead a scientist. In addition, Static Control heavily advertised Mr. Hulse's involvement in the company, presenting him as the aftermarket's preeminent toner scientist and his employment as a major asset to the company. As noted in *Manual Woodworkers & Weavers, Inc. v. Rug Barn,* it is difficult to discern how a geographic restriction based on marketing should pertain to a non-salesperson employee such as Mr. Hulse. No. 1:00CV284–C, 2001 WL 1672253 at *5 (W.D.N.C. Dec.19, 2001) (unreported decision) (noting that an attempt to impose a geographical limitation based on marketing to a manufacturing employee is "like trying to fit a piece of a jigsaw puzzle into the wrong puzzle—even if, by chance, it does fit, it does not look right"). It is with this context in mind that the *Hartman* factors should be examined.

■ The first factor requires a determination of the area or scope of the restriction. Here, Static Control's non-competition agreement with Mr. Hulse has a worldwide scope. North Carolina courts have not held that worldwide covenants are *per se* invalid. *See Farr Assocs.,* 138 N.C.App. at 281, 530 S.E.2d at 882. Worldwide non-competition agreements, however, are unreasonable if an employer only states that it has customers in different states and parts of the world without

providing further documentation. *Id.* at 313–14, 450 S.E.2d at 917–18.

To demonstrate the reasonableness of a geographic restriction, employers should provide evidence of the customer and vendor contacts throughout the geographic area. *Hartman,* 117 N.C.App. at 312–13, 450 S.E.2d at 917. To be valid, the employer should provide a breakdown of revenues from different states and name specific customers. *Id.* An employer who simply states that there are customers in different areas only propounds, "at best, an 'indefinite generality.'" *Id.* at 313, 450 S.E.2d at 917. Instead, to demonstrate the geographic reasonableness of a non-competition agreement, the employer should offer specific evidence that it has more than one or two customers in a particular state or country. *Id.* at 314, 450 S.E.2d at 918 (stating that two or three customers in a state does not warrant a state-wide geographical restriction).

In support of the geographical restriction, Static Control presented the testimony of Edwin Swartz and John Pickett who both stated that Static Control has customers on every continent except Antarctica. This testimony was not specific; rather, it simply revealed the existence of customers without actually identifying the customers or their exact locations. Edwin Swartz testified that Static Control had customers in approximately 100 countries. Static Control also produced a compact disc of toner customer information from 1994 through 2000. *See* Trial Ex. 43. Static Control urges that the compact disc demonstrates that Static Control had sales on every continent except Antarctica in 1995 and 1996. The customer information on the compact disc included the names of foreign customers as well as sales revenues. The compact disc included many thousands of entries of Static Control's sales. The compact disc purports to identify where the foreign customers are locat-ed; however, it only identifies the cities and not the countries. Cities with familiar foreign names therefore must be presumed to be in foreign countries as opposed to simply being cities of the same name within this or other countries. The compact disc does not, significantly, include any entries for 1993, the year in which the agreement was formed, and only includes three entries for 1994. Static Control has not provided information that there are, in fact, customers in all countries and has further not set forth the number of customers in each country.

As for the second and third *Hartman* factors, Mr. Hulse worked primarily in Static Control's Sanford, North Carolina facility. Mr. Hulse, however, traveled to trade shows and had contact with foreign vendors. Because Mr. Hulse worked primarily as Static Control's toner scientist, he was not assigned to work with a specific geographical area. Instead, his services were utilized in all of the regions in which Static Control sold toner.

The fourth *Hartman* factor is where Static Control operated. Static Control operated out of its Sanford, North Carolina facility, but it shipped toner to customers throughout the world. Static Control also advertised Mr. Hulse's recognized expertise extensively in "Recharger," a toner industry magazine.

The fifth *Hartman* factor requires courts to look at the nature of the business which, in this case, was to sell and ship toner to customers around the world.

Finally, the sixth factor considers the employee's duties and knowledge of the employer's business operation. Mr. Hulse was the head toner scientist for Static Control and was primarily responsible for ensuring that Static Control had consistent, quality toners. Mr. Hulse had great knowledge of Static Control's toner information, including trade secret information

as discussed *infra*. As to Static Control's customer information, however, the evidence is less clear. Static Control did not present any evidence that Mr. Hulse had personal contact with customers other than at trade shows. It is therefore impossible to determine Mr. Hulse's knowledge of Static Control's customer base.

The *Hartman* factors are geared primarily toward non-competition agreements involving salespeople with customer information. Here, Mr. Hulse was not a salesperson but was an extremely important part of Static Control's toner sales. Therefore the *Hartman* factors should not be used in a formulaic fashion. Instead, the factors should be considered in context of the particular employment situation.

The geographic territory alone of the non-competition agreement appears unreasonable. Static Control has not shown that there are more than "two or three" customers in all of the countries it seeks to protect, as required by *Hartman*. The testimony of Mr. Pickett and Mr. Swartz is too vague to support the territory covered by the agreement. Further, the compact disc does not demonstrate that Static Control had more than a few customers in some of the countries it which it did business. Furthermore, Static Control has not demonstrated that Mr. Hulse had contact with these customers. It does not appear, however, that Static Control's "primary concern" was Mr. Hulse's knowledge of customers. *Id.* at 313, 450 S.E.2d at 917. Therefore, Mr. Hulse's personal contacts with Static Control's customers should not be heavily weighed. Although Static Control does demonstrate that Mr. Hulse had contact with some vendors, it did not present evidence that these vendors were present in all countries worldwide. Furthermore, Static Control has presented no specific information at all as to its customers in 1993, the year in which the contract was formed and has presented evidence of only three entries in 1994. Because Static Control has not presented adequate specific customer information that it had more than a few customers in each country cited, the geographic restriction by itself is too broad.

Courts must look at the geographic restriction in combination with the temporal restriction. Here, Mr. Hulse would be prohibited from competing for two years. This time period is shorter than that previously deemed under North Carolina law to be *per se* excessive but longer than that previously deemed appropriate for a global agreement. *See American Hot Rod Assoc., Inc., v. Carrier*, 500 F.2d 1269 (4th Cir.1974) (applying North Carolina law and invalidating a non-competition agreement with no geographical limits and a five-year term); *Professional Liab. Consultants, Inc. v. Todd*, 345 N.C. 176, 478 S.E.2d 201 (N.C.1996) (adopting the dissenting Court of Appeals opinion finding that a global non-competition agreement with a five-year term overbroad); *Market Am., Inc. v. Christman–Orth*, 135 N.C.App. 143, 153–54, 520 S.E.2d 570, 578 (1999) (finding a geographically unlimited agreement with a six-month time period reasonable).

Static Control has presented evidence that it maintained its toner testing information and results for two years, that it invested in an extensive two-year advertising campaign featuring Mr. Hulse, and that two years is a reasonable period over which to collect royalties from the sale of a customer list. The two-year period, by itself, appears reasonable; however, when considered—as required under North Carolina law—in combination with the extremely broad geographic limitation, the restriction is overbroad. *See Market Am., Inc.*, 135 N.C.App. 143, 520 S.E.2d 570.

Finally, when combined with the expansive limitations on the particular work Mr. Hulse would be allowed to undertake, it is

clear that the agreement is overbroad. The agreement purports to cover any activity that would involve competition "directly or indirectly with Static Control Components, Inc. in its manufacturing and/or distribution of supplies to remanufacturers of laser printer cartridges." Although Static Control contends that this would enable Mr. Hulse to work for an OEM, OEMs do, in certain situations, sell toners to remanufacturers. Furthermore, the agreement includes indirect competition, which is extremely broad. The agreement also limits Mr. Hulse in any type of competition involving any distribution of any supplies to remanufacturers. This restriction is not limited to Mr. Hulse's area of expertise—toners. Instead, the restriction would apply to any other supplies a remanufacturer of laser printer cartridges might need. Combined with the broad geographic limitation and the relatively substantial time period, the broad scope of the agreement is unreasonable. Although it is possible that Mr. Hulse's unique situation gives rise to an interest that is protected within the area in which Static Control advertised Mr. Hulse's importance,[3] Static Control has not presented evidence of the reach of its advertisements.[4]

The fact that the non-competition agreement is unreasonable and unenforceable as a matter of law presents a question as to the damages phase of the original trial. The jury was not provided with a form on which to document which damages were allotted to which claims. Instead, the jury awarded a blanket amount for both the trade secret misappropriation claim and the tortious interference claim. Because,

as discussed *infra*, the trade secret misappropriation claim stands, Static Control is still entitled to some amount of damages. However, it is impossible to determine which part of the jury's verdict should be allotted to which claim. Therefore, the damages awarded by the jury must be vacated and a new trial must be held as to the damages incurred by Static Control on its trade secret misappropriation claim.

iii.

Darkprint also contends that Static Control did not present sufficient evidence at trial that Mr. Hulse joined Darkprint within two years of his last compensation as a consultant. Because the non-competition agreement is unenforceable, it is unnecessary to determine whether the jury was presented with adequate evidence of this timing issue.

iv.

Darkprint also moved for a new trial because it was prohibited from questioning Darkprint officials as to their good faith belief that the covenant not to compete was invalid. Because the covenant has been deemed unenforceable, this argument is moot.

B.

■ Darkprint contends that Static Control's claim for tortious interference with the non-disclosure agreement is invalid as a matter of law because the agreement is not limited to confidential information. It appears, however, that Darkprint's argument on the validity of the non-disclosure agreement is moot. There was no mention of the non-disclosure agreement in the jury instructions.

---

3. Some states, not including North Carolina, have held that employers have a legitimate business interest when an employee has special, unique, or extraordinary skills. *See, e.g., Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63 (2d Cir.1999); *Natsource v. Paribello,* 151 F.Supp.2d 465 (S.D.N.Y.2001).

4. Static Control did show that "Recharger" is an industry magazine. Furthermore, there was testimony indicating that there is a version for European remanufacturers. Tr. at 546:1.

Instead, the jury instructions pertaining to tortious interference specifically addressed only the non-competition agreement. Furthermore, the verdict sheet specified that the tortious interference claim involved the non-competition agreement and did not mention the non-disclosure agreement. It therefore appears that the non-disclosure agreement was not presented to the jury and, furthermore, that the jury did not find that Darkprint breached the non-disclosure agreement.

### III.

Darkprint next contends that Static Control engaged in numerous acts of discovery misconduct which warrant a new trial under Fed.R.Civ.P. 60(b)(3). First, Darkprint argues that Static Control did not identify or disclose its trade secrets until trial. Second, Darkprint alleges that Static Control did not disclose its damages calculations until the day before trial commenced.

### A.

A new trial will be granted under Fed.R.Civ.P. 60(b)(3) if the moving party can demonstrate that: (1) it has a meritorious defense; (2) that the non-moving party committed misconduct, as demonstrated by clear and convincing evidence; and (3) the misconduct prevented the moving party from fully presenting its case. *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir.1994); *Moeller v. D'Arrigo*, 163 F.R.D. 489, 493 (E.D.Va.1995). Once the court evaluates these three elements, it must balance the "competing policies favoring the finality of judgments and justice being done in view of all the facts, to determine, within its discretion, whether relief is appropriate in each case." *Schultz*, 24 F.3d at 630 (citation omitted). The Fourth Circuit has noted that "Rule 60(b)(3) focuses not on erroneous judgments as such, but on judgments which were unfairly procured. When wrongful

secretion of discovery material makes it inequitable for the withholder to retain the benefit of the verdict, the aggrieved party should not be required to assemble a further showing." *Id.* at 631 (citation omitted). Furthermore, the Fourth Circuit has found misconduct within the meaning of Rule 60(b)(3) occurs when a party fails to produce "obviously pertinent requested discovery material." *Id.* at 630 (granting a Rule 60(b)(3) motion when a party failed to disclose a report which stated that there was no evidence that the moving party was moving at an excessive speed or that it acted improperly).

### B.

First, it should be noted that Static Control has not contested whether Darkprint has a meritorious defense in this case. Instead, Static Control focused on whether it committed misconduct and whether Darkprint was prevented from fully presenting its defense.

Darkprint's request for a new trial due to discovery misconduct in relation to Static Control's trade secret information involves a complicated and confused discovery process. Both parties filed motions to compel in 2000, both of which were granted. Unfortunately, neither side fully complied with the order in a timely fashion. Darkprint served an interrogatory on Static Control requesting the identification of the specific trade secret information Static Control claimed had been misappropriated. Darkprint later conducted a Rule 30(b)(6) deposition on Static Control's witnesses to determine the specific trade secrets Static Control intended to claim at trial. Static Control's witnesses were unable to inform Darkprint of the specific "tested but not used" toner information that they claimed as trade secrets although they did provide Darkprint with categories of trade secrets that they intended to claim. At some point, Static Control's deposition witnesses informed Darkprint that Mr. Hulse's co-

workers did know the specific "tested but not used" toner information. At the time of these depositions and the interrogatory, however, Darkprint had not yet complied with Static Control's discovery requests and had not provided Static Control with its information that identified the specific toners it was matching to the remanufacturer of different types of toner cartridges. Without Darkprint's information, Static Control was unable to specify which toner information Darkprint had misappropriated.

As of a pretrial hearing on September 21, 2001, barely a month prior to the commencement of trial, neither Static Control nor Darkprint had turned over all requested discovery documents. At the September 21 hearing, the Court ordered Darkprint to provide the Court with a list of common toners sold to common customers by September 26, 2001. Darkprint provided the ordered information to Static Control on September 26 as required. On September 28, 2001, the Court ordered Static Control to provide both Darkprint and the Court a specific list of its claimed trade secrets by October 1, 2001. On October 1, Static Control provided the Court and Darkprint with a list of its claimed trade secrets. This list, however, only contained broad categories of trade secrets such as: (1) "[t]he identities of suppliers whose toner Static Control had tested and rejected, and the reason for the rejection"; (2) "[t]he types of toner products purchased by Static Control from specific suppliers"; (3) "[t]he range of uses for specific toner products, including whether a specific type of toner could be re-sold for several different applications"; (4) "[t]he quality and consistency of specific toners from specific suppliers, gathered through testing over time"; and (5) "information on the compatibility of specific toners with other aftermarket components." Static Control's Resp. to Ct.'s Questions, Ex. A [Doc. # 104]. Static Control did not identify specific "tested but not used" toner information.

Approximately one week before trial, and two weeks after the Court ordered disclosure of its specific trade secrets, Static Control's counsel met with John Pickett, its toner scientist, about the specific toner information.[5] According to Static Control, the specific "tested but not used" toner information was not kept in documentary form but instead was only available from a witness such as Mr. Pickett who recalled the testing information from personal experience. It is clear that Static Control's counsel did have knowledge of the specific "tested but not used" toner information one week prior to trial. Furthermore, it is clear that counsel did not inform Darkprint's counsel about Mr. Pickett's testimony as to specific "tested but not used" toner information before trial. Tr. at 519:21–22. Darkprint was unaware of the specific trade secrets that Static Control claimed until the second day of trial when Mr. Pickett took the stand. Static Control stated that it did not provide Darkprint with Mr. Pickett's specific "tested but not used" toner information prior to trial because it "just did not occur to Static Control" that it should have done so. Tr. at 520:17–21.[6]

■■■ Darkprint contends that Static Control's failure to provide specific infor-

---

5. It is unclear from the record whether Static Control's counsel met with Mr. Pickett earlier than one week before trial. Furthermore, the record does not contain any evidence as to why Static Control did not meet with Mr. Pickett before the October 1, 2001 deadline set by the Court.

6. During the trial, Static Control argued that it thought that Darkprint already had enough information to determine the specific trade secrets. Tr. at 520:17–21.

mation of the "tested but not used" toner information prior to trial constitutes discovery misconduct under Rule 60(b)(3). Darkprint is correct that Static Control should have responded to its discovery requests prior to Mr. Pickett's testimony. Whether the omission warrants the relief requested depends upon the scope of the omission, including the extent and effect of the omission. As noted above, Darkprint knowingly failed to respond to Static Control's discovery requests [7] and, from 2000 until September 21, 2001, willfully ignored a court order to provide the information. Static Control therefore was unable to produce the requested discovery until it received Darkprint's requested discovery on September 26 and had the opportunity to process the information and determine which, if any, of Darkprint's toners for specific cartridges and components were those Static Control had identified as second or next best alternatives.[8] Therefore, even though Darkprint correctly notes that a Rule 30(b)(6) witness is required to identify claimed trade secrets, *Marker v. Union Fidelity Life Ins. Co.*, 125 F.R.D. 121, 126 (M.D.N.C.1989), Static Control was hamstrung in this case until September 26 because of Darkprint's own failure to disclose information.

Static Control's conduct after it received Darkprint's information on September 26, 2001, however, is not as easily justified. Static Control received Darkprint's information on September 26, 2001 but still did not provide either Darkprint or the Court with specific trade secret information as requested by the Court. Instead, Static Control merely presented the Court with a broad list of trade secret categories on October 1, 2001. This list did not include the specific information sought by Darkprint. It appears from the record that Static Control's counsel only met with Mr. Pickett approximately one week before trial. Static Control provided no explanation or justification for why it waited so long to meet with Mr. Pickett to ascertain the specific toner information. This is especially troubling when placed in the context of the Court's request that Static Control present specific trade secret information by October 1. Furthermore, Static Control's explanation that "it just did not occur" to Static Control to turn over this important information within the week before trial is irrelevant to whether it committed discovery misconduct because Rule 60(b)(3) applies equally to intentional and inadvertent failures to disclose. *Schultz,* 24 F.3d at 630. The record therefore provides clear and convincing evidence of Static Control's failure to disclose specifically requested and ordered discovery materials. Static Control's behavior in regard to the Court's request that it turn over its information thus constituted misconduct under Rule 60(b)(3).

Determining whether Static Control engaged in discovery misconduct in relation to its specific trade secret information, however, is only one part of the test courts must use when determining whether a new trial is warranted pursuant to Rule 60(b)(3). Darkprint still has the burden of demonstrating that Static Control's misconduct prevented Darkprint from fully presenting its defense. *Schultz,* 24 F.3d at 630.[9] Darkprint contends that Static Con-

---

7. While Darkprint knew what toner it was selling for various cartridge models, it would have only known of Static Control's interest in that information from Static Control or from someone revealing a Static Control trade secret.

8. Darkprint conceded at trial that it had not objected to Static Control's discovery requests even though it contends that the requests were overbroad.

9. Darkprint correctly notes that the correct standard under Rule 60(b)(3) is whether the moving party was prevented from fully pre-

trol's misconduct prevented it from rebutting evidence that Darkprint used Static Control's toner information and from explaining how Darkprint determined which toners to use. Darkprint argues that, had it known the substance of Mr. Pickett's testimony prior to trial, it could have conducted additional discovery, investigation and preparation for trial. Specifically, Darkprint contends that, had it known the specific trade secret information it would have researched: (1) the specific results of the testing about which Mr. Pickett testified; (2) the data that resulted from the testing; (3) whether Mr. Hulse could have reasonably recalled the data when he left to work for Darkprint; (4) whether the specific data would have helped Darkprint market toners that were compatible with its patented mag rollers; and (5) the number and extent of toners that Static Control tested but did not use that Darkprint did not use.

Static Control argues, however, that Darkprint was not prevented from fully presenting its case. Static Control points out that Darkprint was able to call Randy Roderick, Darkprint's President, who testified as to Darkprint's testing and selection methods. Mr. Roderick also testified that he did not receive any specific testing information from Mr. Hulse, that he was unaware of Static Control's testing measures, and that Darkprint conducted its own independent testing and toner development. Static Control contends that Darkprint's strategy was to show that the overlap of toners tested by Static Control

and used by Darkprint resulted from the limited number of toners available.[10]

Although Static Control clearly engaged in discovery misconduct, it cannot be said that its misconduct prevented Darkprint from fully presenting its case. Although Darkprint did not have access to the specific information prior to trial, it did have the opportunity to cross-examine Mr. Pickett and question his memory and the test results. Darkprint could also have questioned Mr. Hulse about the testing results. In fact, Darkprint did ask Mr. Hulse whether he recalled the specific test results of toners Mr. Hulse had tested for Static Control, and Mr. Hulse testified that he did not remember the results at the time he started work for Darkprint. Tr. 1029–30. Furthermore, Darkprint questioned Mr. Hulse at trial about the applicability of Static Control's test results to Darkprint's mag rollers. Tr. 1031–32. Darkprint's contention that it would have been able to discover the number and extent of toners that Static Control tested but did not use and that Darkprint did not use is also not persuasive since its answer is of little utility. Darkprint's toners worked for the cartridges with which they were matched. The identity of other toners tested by Static Control but not used by Darkprint has little probative value. Darkprint could have questioned either Mr. Pickett or Mr. Hulse on this issue at trial. Darkprint also questioned Mr. Roderick as to Darkprint's testing procedures and asked Mr. Roderick whether Darkprint used Static Control's testing informa-

---

senting its case and not whether the moving party was precluded from presenting its case. Although Static Control uses the term "precluded" in the body of its Resp. To Darkprint's Mot. For J. As a Matter of L. Or for a New Trial [Doc. # 140], it does identify the correct standard at the beginning of its argument.

**10.** Static Control also contends that all Darkprint needed to know was the identity of Darkprint's toners and the process Darkprint used to select the toners, information that Darkprint had all along. However, Darkprint only had access to general toner information and was not aware of which toners Static Control was testing and not using for particular cartridges.

tion. Furthermore, it is important to note that Darkprint did not request a continuance once Mr. Pickett testified. Instead, Darkprint requested that portions of Mr. Pickett's testimony be stricken and a limiting instruction be fashioned. Tr. 410:11–21.

Darkprint has not pointed to any specific research it would have conducted aside from the general investigation noted above. With the information before the Court, it does not appear that Darkprint would have been able to do anything more than it already did at trial. It is hard to determine what Darkprint could have done differently had it been provided with the specific testing information prior to trial. Although Darkprint contends that it could have researched the data, Darkprint does not explain how, aside from questioning Mr. Pickett as it did at trial, it could accomplish this.

Darkprint also questioned witnesses at trial as to Darkprint's testing process and whether Mr. Hulse had disclosed Static Control's information. Darkprint questioned Mr. Roderick extensively about the toner selection process at Darkprint. Furthermore, Darkprint specifically asked Mr. Hulse at trial whether he had disclosed any of Static Control's information to Darkprint. Therefore, Darkprint's contention that it was prevented from demonstrating that it did not use Static Control's toner information and how it picked certain toners is not persuasive.

Finally, when balancing the competing policies of the finality of judgments and the interest of justice, it appears that Darkprint was able to adequately present its defense. Although Static Control engaged in discovery misconduct, Darkprint has not satisfied its burden of showing that this misconduct prevented it from fully presenting its defense. Instead, Darkprint has only presented vague allegations of lost research and investigations. The jury was presented with a full defense and found in favor of Static Control anyway. Therefore, the balance tips in favor of not disturbing this portion of the jury's verdict.

While it is no justification for Static Control's failure to turn over the information once it had identified specific toners it claimed had been misappropriated by Darkprint, Darkprint's own failure to produce discovery and to comply with the Court's order compelling production greatly truncated the normal process. Had the information been provided either as requested or as initially ordered, there would have been time for Darkprint to have filed a motion to compel and for the Court to have compelled Static Control's provision of the specific information well in advance of trial.

### C.

Darkprint next contends that Static Control engaged in discovery misconduct by not providing its damages calculations until the day before trial commenced. Darkprint argues that it requested Static Control's damages calculations far before trial and that Static Control simply failed to produce its information despite an order to compel. Darkprint also contends that Static Control's Rule 30(b)(6) witness did not provide specific information as to its methodology and did not provide specific calculations.

Darkprint's Rule 60(b)(3) motion on Static Control's damages case is moot. Because a new trial on damages is required due to the invalidity of the non-competition agreement, Darkprint will have the opportunity to conduct any further non-discovery investigation it wishes prior to the next damages trial.

## IV.

Darkprint contends that either judgment as a matter of law or a new trial should be granted on the damages verdict. Darkprint argues that Static Control did not present any competent damages evidence and instead relied on the lay opinion testimony of William Swartz. Furthermore, Darkprint contends that Static Control did not properly take market forces into account when presenting its damages calculation.

Although Darkprint's motion is moot in light of the new trial ordered on the damages case, an analysis of its specific objections is provided for guidance in later proceedings.

### A.

Darkprint contends that Static Control improperly relied on a lay witness to establish its damages at trial. Static Control's damages case was presented solely through the testimony of William Swartz, president of Static Control's imaging department. William Swartz was not designated as an expert witness, and Static Control contends that he need not be an expert witness to testify to damages because he had firsthand knowledge of Static Control's pricing and profit margins over a number of years.

Although parties often enlist the help of expert witnesses to determine damages calculations, business owners and officers are allowed to make damages calculations if they have sufficient personal knowledge of the facts. *See* Fed.R.Evid. 701 advisory committee's note; *Mississippi Chem. Corp. v. Dresser–Rand Co.*, 287 F.3d 359, 373 (5th Cir.2002); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir.1995); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir.1993); *Nichols v. Johnson*, No. 00 C 7785, 2002 WL 826482 at *6 (N.D.Ill. May 1, 2002); *KW Plastics v. United States*

*Can Co.*, 131 F.Supp.2d 1265 (M.D.Ala. 2001). Such business owners and officers are allowed to testify as lay witnesses under Fed.R.Evid. 701. The business owner or officer, however, must possess personal knowledge of the lost profits and damages and may not rely on hearsay. *See TLT–Babcock, Inc. v. Emerson Elec. Co.*, 33 F.3d 397, 400 (4th Cir.1994); *KW Plastics*, 131 F.Supp.2d at 1273. The key question is therefore whether there is a foundation upon which the lay witness can testify regarding lost profits. If Static Control is able to elicit the proper foundation from William Swartz during the new damages trial, it would be able to use him as a witness on lost profits. It should be noted that the record appears to provide more than a sufficient foundation for Mr. Swartz's testimony. At trial, William Swartz testified about his own impressive formal business education and, then, extensively as to his experience with toner pricing, pricing trends, gross profit margins, and seasonal pricing differences. It is thus likely that Static Control would be able to provide an adequate foundation for William Swartz's testimony at the new damages trial.

### B.

Darkprint contends that Static Control's damages calculation was deficient because it did not establish the probability that Static Control would have made every sale that Darkprint made and did not account for the possibility that a number of Darkprint's sales would have gone to toner distributors other than Static Control. Because a new trial is required on the damages issue, the question of whether Static Control's evidence at the first trial was adequate is moot.

### V.

Darkprint next argues that the jury instruction on trade secret misappro-

priation was incomplete, thus requiring a new trial pursuant to Rule 59. Inaccurate jury instructions can be the basis for a new trial under Rule 59. *See Burkett v. United States Postal Serv.,* 32 F.Supp.2d 877, 880 (N.D.W.Va.1999). Darkprint contends that the jury instruction should have distinguished between trade secrets and unprotected generalized skills and knowledge. Although Darkprint correctly asserts that generalized knowledge and skills cannot be protected as trade secrets under North Carolina law,[11] the jury instruction at issue adequately stated the law.

The Court's jury instruction defining trade secrets under North Carolina law provided, in part, that:

The North Carolina Trade Secrets Protection Act defines a trade secret as business or technical information, included but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process. A trade secret does not have to be a specific formula or defined process. A trade secret may include research data that would give a competitor a competitive advantage that it would not otherwise have, such as information about toners that were tested and not sold.

The jury instruction further provided that, in order to prevail, Static Control must have "derive[d] independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from disclosure or use." The instruction also explained that, in order to constitute a trade secret, the plaintiff was required to make reasonable efforts to maintain the secrecy of the information. Finally, the instruction listed factors to use in determining whether the information should be deemed a trade se-

cret. The jury was provided with a detailed verdict sheet that required the jury to determine which specific information should be treated as a trade secret. North Carolina Pattern Instruction 813.90 also makes no reference to generalized skill or knowledge.

The contested instruction adequately explained the legal definition of a trade secret. Although the instruction did not specifically exclude generalized skill and knowledge, it did state that in order to be a trade secret, the information must "derive independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from disclosure or use." This instruction is sufficient to exclude generalized skills and knowledge. Because the instruction sufficiently set forth the legal definition for trade secrets, it does not warrant a new trial.

### VI.

Darkprint next contends that Static Control did not present sufficient evidence at trial that Darkprint used any of the misappropriated trade secrets. Darkprint thus argues that either judgment as a matter of law or a new trial should be granted.

### A.

■■■■ Judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) questions whether "a jury ... could have properly reached the conclusion set by this jury." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644 (4th Cir.2002) (citation omitted). Judgment as a matter of law will not be granted if "reasonable

**11.** *See Kadis v. Britt,* 224 N.C. 154, 162, 29 S.E.2d 543, 547–48 (1944); *Travenol Labs.,* *Inc. v. Turner,* 30 N.C.App. 686, 694, 228 S.E.2d 478, 485 (1976)

minds could differ" as to the verdict. *Id.* Instead, judgment as a matter of law should be granted if "a reasonable jury could only rule in favor of [Darkprint]." *Id.* All evidence will be viewed in the light most favorable to Static Control, the non-moving party, and all reasonable inferences will be drawn in Static Control's favor. *South Atl. Ltd. Partnership of Tennessee, LP v. Riese,* 284 F.3d 518, 532 (4th Cir.2002). Furthermore, courts should not engage in a weighing of the credibility of witnesses or the evidence when analyzing a motion for judgment as a matter of law. *Princess Cruises, Inc. v. General Elec. Co.,* 143 F.3d 828, 831 (4th Cir.1998).

▬ Darkprint argues that Static Control did not present sufficient evidence of any specific trade secrets, Darkprint's misappropriation of the trade secrets, or of Darkprint's use of the trade secrets. Darkprint contends that Static Control's evidence of Darkprint's use of the trade secrets consisted solely of testimony regarding overlap between Static Control and Darkprint's customer lists and charts demonstrating that Darkprint used several of Static Control's "tested but not used" toners.

Darkprint's allegations of insufficient evidence are unpersuasive. At trial, Static Control presented specific evidence of "tested but not used" toners through the testimony of Mr. Pickett. Static Control also provided evidence of the overlap in toners tested by Static Control and used by Darkprint to demonstrate Darkprint's use of the "tested but not used" toner testing information. Static Control also offered into evidence the conversation between Mr. Gaylord of Darkprint and Mr. Hulse, then with Static Control and the focal object of having been advertised to the trade as the market's leading toner scientist, in which Mr. Gaylord stated, "Boy, I sure wish we had your toner," and Mr. Hulse responded, "Well, maybe you can." Static Control presented evidence that Darkprint was very anxious to hire Mr. Hulse after the suspicious conversation between Mr. Gaylord and Mr. Hulse. Specifically, Static Control demonstrated that Darkprint gave Mr. Hulse an unusually large amount of stock in the company and that in recruiting Mr. Hulse, Darkprint suggested that it might be willing to set up paper headquarters to avoid legal complications arising out of the non-competition agreement. Additionally, Static Control presented evidence of the speed with which Darkprint and Mr. Hulse were able to designate and begin selling specific toners for particular cartridges when compared to the time it took Mr. Hulse to undertake similar designations while at Static Control. And finally, Static Control showed that the rapid Darkprint designations were made while the toner testing equipment purchased by Darkprint had not been unboxed.

Although Static Control has not presented direct evidence of Darkprint's misappropriation or use of trade secrets, North Carolina law recognizes that circumstantial evidence can be sufficient in a trade secret case. *Byrd's Lawn & Landscaping, Inc. v. Smith,* 142 N.C.App. 371, 377, 542 S.E.2d 689, 693 (2001). Because Static Control presented a strong circumstantial case at trial, judgment as a matter of law in favor of Darkprint is not warranted. At the very least, reasonable minds could differ as to the existence of the trade secrets and Darkprint's misappropriation and use of the trade secrets.

**B.**

▬ Darkprint also contends that insufficient evidence relating to the existence of trade secrets and Darkprint's misappropriation and use of the trade secrets warrants a new trial pursuant to Fed.R.Civ.P. 59. Under Rule 59, the jury's verdict

must be set aside and a new trial must be granted if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Knussman v. Maryland,* 272 F.3d 625 (4th Cir.2001) (citations omitted). Furthermore, a review pursuant to Rule 59(e) enables courts to weigh the evidence, including evaluating credibility issues. *Dennis,* 290 F.3d at 650; *Mercer v. Duke Univ.,* 181 F.Supp.2d 525, 547 (M.D.N.C. 2001).

Darkprint's argument in regard to its motion for a new trial because of insufficient evidence of Darkprint's use or misappropriation of Static Control's trade secrets is identical to its argument for judgment as a matter of law. As discussed *supra,* Static Control provided sufficient evidence of the existence of trade secrets as well as misappropriation and use of the trade secrets. Because the jury's verdict is not against the clear weight of the evidence in this case, a new trial is not warranted under Rule 59(e) based on the sufficiency of Static Control's trade secret evidence.

## VII.

Darkprint next contends that it is entitled to a new trial because it was not allowed to impeach Edwin Swartz through a prior statement made by his attorney, Skip London, and was not allowed to produce extrinsic evidence of the statement through the so-called Bay–Bro affidavit. Defendant contends that the Court's refusal to admit the Bay–Bro affidavit prohibited Darkprint from adequately impeaching Edwin Swartz's credibility.

The Bay–Bro affidavit involved a prior, unrelated case [12] in which Edwin Swartz stated that he had not traveled to Florida

to negotiate an agreement or conduct business. Later, Mr. London stated during a deposition that Edwin Swartz had voluntarily traveled to Florida at some point to visit his mother-in-law and that, while in Florida he discussed business. Mr. London related that Edwin Swartz, however, contended that he had not traveled to Florida for the purpose of doing business but instead that his business was incidental to his visit with his mother-in-law. Furthermore, Mr. London told the judge in the unrelated case that Mr. Swartz's earlier statement was untruthful.

Fed.R.Evid. 608(b) states that "[s]pecific instances of the conduct of a witness, for the purpose off attacking or supporting the witness' credibility, other than conviction of a crime ... may not be proved by extrinsic evidence." In *United States v. Lutz,* 153 F.3d 723, 1998 WL 486345 (4th Cir.1998) (unpublished), however, the Fourth Circuit distinguished between prior conduct and prior statements. In *Lutz,* the government introduced prior statements made by the defendant to rebut the defendant's claim that he never lied under oath. *Lutz* noted that prior statements differ from prior conduct and that such prior statements could be admitted as a statement of a party opponent or as a prior inconsistent statement.

In the case at hand, however, the allegedly conflicting statements are barely probative and highly confusing and prejudicial. There remains a dispute as to whether the statement in the affidavit was indeed false because it is unclear that Edwin Swartz traveled to Florida to conduct business. Even if the statement was technically false, it would likely confuse the jury and would not present much probative value. It is also important that Mr. London, not Mr. Swartz, stated that the

---

**12.** *Bay–Bro Corp. v. Static Control Compo-* *nents, Inc.,* No. 97–407 (M.D.Fl.).

earlier statement was false. Mr. London was acting on Static Control's behalf in that proceeding. Even if Mr. London had been acting as Mr. Swartz's personal attorney and had the authority to make statements that were legally binding, the issue before this jury was Mr. Swartz's personal credibility and not Mr. London's opinion about it. Furthermore, because Mr. London was one of Static Control's trial attorneys in the present case, the prejudice of injecting his opinion would have substantially outweighed any possible probative value the statement might have had. Therefore, pursuant to Fed.R.Evid. 403, the questions surrounding the Bay–Bro affidavit were properly excluded at trial and Darkprint will not receive a new trial on this issue.

## VIII.

Darkprint next contends that a new trial is warranted because of the Court's refusal to allow the testimony of Walter Huffman. Mr. Huffman is a former employee of Static Control who alleges that Edwin Swartz only brought the instant lawsuit in an effort to harass Darkprint, which was in the process of suing Static Control in a Colorado district court for patent infringement. Furthermore, Darkprint contends that Mr. Huffman would have testified that Edwin Swartz admitted that Static Control's claims against Darkprint had no merit. Darkprint alleges that Mr. Huffman would have provided valuable impeachment testimony and that the exclusion of the testimony "prevented Darkprint from 'fully developing evidence relevant to a material issue'—the lack of merit in Static Control's claims." Darkprint's Br. in Supp. of Mot. for J. as a Matter of L. at 16–17 [Doc. # 138].

Static Control argues, however, that Darkprint waived its objection to the exclusion of Mr. Huffman's testimony and thus cannot revive the issue at this stage. Static Control notes that it filed a motion in limine to exclude Mr. Huffman's testimony and that the Court did not definitively rule on the motion prior to trial, leaving it open for further consideration should Darkprint wish to pursue it by voir dire at trial. Static Control also notes that Darkprint did not attempt to call Mr. Huffman at trial and therefore, Static Control argues, Darkprint waived its objection to the alleged exclusion of Mr. Huffman's testimony.

■ If a court definitively rules on a motion in limine prior to trial, the unsuccessful party need not renew its objection during trial. *See Walden v. Georgia–Pacific Corp.*, 126 F.3d 506, 518–19 (3d Cir. 1997); *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir.1996). If the court does not definitively rule on such a motion, however, the opposing party must renew its objection or attempt to offer the evidence at trial. *Walden*, 126 F.3d at 518; *Williams*, 81 F.3d at 1325.

■ In the instant case, the Court did not make a definitive ruling on Static Control's motion in limine during the pretrial hearing. During the pretrial hearing, the Court initially stated that "I will deny that, [Huffman's] statement. I will deny it." Sept. 21, 2001 Tr. at 110:4–5. After this statement, however, defense counsel continued to argue the merits of Mr. Huffman's statement. After the Court and defense counsel further discussed Mr. Huffman's testimony, the Court noted that,

> But assuming that that ruling stays there is nothing in this transcript that would come in, the next question then would be, what would you be entitled to ask Mr. Huffman on the stand and I'm not sure that there is anything he could testify to before the jury, but if you feel there is, then put him on the stand and we'll hear him out of the presence of the jury and hear what you would like for

him to testify to before the jury and then make a determination.

Sept. 21, 2002 Tr. at 112:13–21. During the trial, the Court asked defense counsel if it intended to call Mr. Huffman as a witness to which defense counsel replied

Your Honor, we haven't decided yet. Certainly I understand the Court's prior ruling that it would want to hear Mr. Huffman's testimony outside the presence of the jury. In light of that, in light of the Court's prior comments concerning Mr. Huffman's proffered testimony, we are seriously considering not calling Mr. Huffman. If we change our minds on that, which I think probably based on the current stage of the trial would be tonight, we could take that up tomorrow.

Tr. at 967:16–24. Darkprint did not later attempt to call Mr. Huffman as a witness.

The transcript clearly demonstrates that Mr. Huffman's testimony was not clearly excluded during the pretrial hearing and that Darkprint did not attempt to call Mr. Huffman outside of the jury's presence at trial. Darkprint therefore failed to preserve its objection for review at this time.

However, even if the matter had not been waived, the testimony was simply not relevant. As discussed in Part VI. A., the evidence relating to trade secret misappropriation was more than sufficient to support a jury finding in favor of Static Control. Mr. Edwin Schwartz' subjective view of sufficiency is not probative of any material fact in issue before the jury.

## IX.

Darkprint also contends that the punitive damages award is excessive and warrants either remittitur or a new trial pursuant to Fed.R.Civ.P. 59. Because a new

trial on damages has been ordered, it is unnecessary to determine whether the punitive damages provided for by the jury were excessive.

## X.

Static Control contends that Darkprint's misappropriation of trade secrets violates North Carolina's Unfair and Deceptive Trade Practices Act. N.C. Gen.Stat. § 75–1.1.[13] Static Control notes that Darkprint stipulated that the acts were in or affecting commerce and that the jury's verdict in favor of Static Control fulfilled the requisite conduct. Darkprint did not address whether misappropriation constituted an unfair or deceptive trade practice. Instead, Darkprint focused solely on the issue of attorneys' fees.

 To establish a claim for unfair trade practices, Static Control must show that: (1) Darkprint engaged in an unfair or deceptive act or practice, or unfair means of competition, (2) that is in or affects commerce, (3) that is the proximate cause of Static Control's actual injury. *Walker v. Sloan,* 137 N.C.App. 387, 395, 529 S.E.2d 236, 243 (2000). An act is "unfair" under § 75–1.1 if it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." *Id.* at 399, 529 S.E.2d at 245 (quoting *Jones v. Capitol Broad. Co.,* 128 N.C.App. 271, 276, 495 S.E.2d 172, 175 (1998)). Whether an act constitutes an unfair or deceptive trade practice is a question of law for the court to decide. *Morris v. R.G. Bailey & Bragg Auto Home Sales,* 86 N.C.App. 378, 382, 358 S.E.2d 120, 123 (1987).

 In the instant case, the jury found that Darkprint hired Mr. Hulse from Stat-

---

13. Static Control also contended that Darkprint's tortious interference with the non-competition agreement constituted a violation under the Act. However, because the non-

competition agreement has been deemed unenforceable, the analysis will be limited to a violation of the Act based on Darkprint's trade secret misappropriation.

ic Control and gained access to and misappropriated Static Control's trade secrets. This conduct is surely "immoral, unethical, oppressive, unscrupulous, or substantially injurious." The jury's verdict reflects the evidence that Mike Gaylord, Darkprint's vice president, actively sought out Mr. Hulse after the discussion in which Mr. Gaylord had remarked "I sure wish we had your toner," to which Mr. Hulse had replied, "Well, maybe you can." Furthermore, at trial, Static Control presented evidence that after Mr. Hulse began working at Darkprint, new toners—each of which Mr. Hulse had analyzed at Static Control—were introduced to the market by Darkprint in a much shorter time frame than when he was testing and selecting toners at Static Control. This is especially troubling because Darkprint ordered but never used testing equipment used by Static Control to analyze toners. The jury therefore was able to find that Darkprint had misappropriated Static Control's trade secrets, as discussed *supra.*

The North Carolina Court of Appeals has held that trade secret misappropriation can constitute a violation of § 75–1.1 if it also affects commerce and is the proximate cause of Static Control's actual injury. *See Drouillard v. Keister Williams Newspaper Serv., Inc.,* 108 N.C.App. 169, 172, 423 S.E.2d 324, 326 (1992). Darkprint has admitted that its actions affected commerce. Furthermore, the jury found that the misappropriation was the proximate cause of Static Control's monetary injury, as evidenced by the verdict. Static Control has thus demonstrated a cause of action for unfair or deceptive trade practices.

## XI.

Static Control has also moved for attorneys fees pursuant to both N.C. Gen.Stat. § 16.1 of the Unfair and Deceptive Trade Practices Act and N.C. Gen.Stat. § 66–154 of the Trade Secret Protection Act. Because a new trial on damages is required,

it would be premature to determine if attorneys fees should be assessed and, if so, in what amount. Therefore, the Court will reserve a ruling on this issue until the next damages trial.

## XII.

In conclusion, Darkprint's motion for judgment as a matter of law on Static Control's tortious interference claim is GRANTED, its motion for a new trial for discovery misconduct is DENIED, its motion for judgment as a matter of law or a new trial on damages is MOOT, its motion for a new trial on the trade secret misappropriation instruction is DENIED, its motion for judgment as a matter of law as to the sufficiency of the evidence in regard to the trade secret misappropriation claim is DENIED, its motion for a new trial on evidentiary issues is DENIED, its motion for a new trial to introduce Darkprint's good faith belief of the invalidity of Mr. Hulse's non-competition agreement is MOOT, and its motion on punitive damages is MOOT. Static Control's motion for judgment on its unfair trade practices claim is GRANTED and its motion for attorneys' fees is reserved until the next damages trial. In accordance with this ruling, the damages award is hereby SET ASIDE and a new trial is ORDERED as to damages.